The next case for argument is 22-1861, IBM v. Zillow Group. May it please the Court, Gautham Putnike with John Damaris on behalf of IBM. Both patents at issue in this appeal are directed to better capturing and utilizing user context variables in a search system to rank and prioritize search results provided to a user. User context is information about the user, including information such as the user's demographics, background, as well as the user's prior searches and selected results in that search system. User context variables are mapped to the search results to better weigh and rank them so that the most relevant results are provided to the user. This differs than what was in the prior art, which either didn't use context variables or information or was only able to use a limited amount of user context information. Does the patent describe how those determinations are made? How it aligns in order what the most useful, most relevant? There's an order and annotation. I know that's what the claims say in order and annotation. Do we know what that means or how that's done? Well, I think the scope of the patent is more on the acquiring of the user context information and then applying it to that algorithm, the order and annotation algorithm. The scope of the claims is not the order and annotation algorithm itself or the focus of the claims. But is it the claim language in that particular claim? I guess we're talking about the 676 patent. Is it result-oriented in its language or is it a specific implementation? And if it is a specific implementation, what exactly in the claim language would compel you to say so? 676, claim 14. I just want to make sure we're talking about the same thing. Sure. In that claim language, it is not result-oriented in the sense that it is focusing on a user context vector and what is in the vector and how is it applied to the order and annotation algorithm. What is a vector? Sure. The vector is a data structure that's claimed in the patent and it has specific information. It has the user context that's been acquired in past searches as well as the current search. It also has the user's preferences and attributes that they want to focus on. For instance, if it's a business person who's over 50 and has certain preferences on the types of hotels they stay in, that could be user context attributes that are captured in that vector. The important part here and the patent talks about the use of the vector to help with machine learning and the reason the vector becomes important, the structure of it, and it's specific per our claim construction in the lower court, was that there's a certain amount of, it's the n-dimensional, meaning the number of attributes that we want to capture, and there's heterogeneous data. What does that mean? That means that all these attributes are disparate types of information. What the vector does and the importance of it in this patent is the vector makes all that information homogenous so it can then be used and applied to the algorithm. What do you mean by it makes it homogenous? Meaning the same type of information for machine learning. It's the conversion of disparate information into data that can be used for the machine learning. So there's no limitation, I mean this isn't like the Wiesner case where you're just talking about travel. You used an example of what the user might do, but the user context vector includes just any search information regarding a particular user that they've ever used on anything, and then when they do a particular search to buy a car, it sorts out the car-related stuff and ranks it? A little different, Your Honor. If you look at the 193 patent, for instance. Well, I'd like to, but if we can focus on the 676. Sure. Whatever the user selects as the attributes that it cares about are the ones that will be focused in the vector, will be included in the vector. So the search deals with a car. But it deals with everything, anything and everything that the user has ever searched for. Within the specific self-service system. The claims are dealing with the specific self-service system. So if you think about like a rental agency, if you want to go to a rental agency and you want to pick what kind of car you like, you can input that information into the system and it will generate better options based on what your preferences are. I'm still not clear on what limits, if any, exist in terms of the kind of information that's in the user context vector. But more importantly for me is, Judge Stoll, I think, used the words, how do you do it? How is this, the information is sorted out? I mean, what is this invention is you then have this information in the user context vector and then based on the search that's done by the user, something happens to prioritize all of the historical information you have in the user context vector? A little different, Your Honor. It is the, what you did, what you searched before, that data will go into the vector. So it will become a relevant data point for the next analysis. And the next analysis is using your past searches in part, as well as your current search, figure out what would be most apt for you. And how does it do that? Do we have any information in the spec about how that step is done? Well, that is the order, that's the order and annotation algorithm, which this is more about how do you get the user context variables and then the use of it and the application of it is the algorithm in the order and annotation algorithm. But the order and annotation algorithm is claimed, right? It's part of the claim, but the focus of the claim is the use of the user context vector. And what does it mean exactly when you say mapping user context vector onto, you know, I think it's the response that... The search results. So if you have the user context vector and you have the data that you've homogenized, meaning you can use it. Is mapping a computer science construct and what does it mean? It does. It means comparing the search results that you have and using the user context vector to then, to figure out which ones are most relevant. I'm sorry, when you keep saying user context vector, you mean what? Information about the user? In a specific format, Your Honor. It's what's claimed and put in the spec. What do you mean by specific format? Sure. I can give you a site. So. Sorry. So if you look at appendix 106. Column 19 lines 35 to 62. This talks about the customer self-service system. I'm sorry, columns 35 to 62. Column 19 lines 35 to 62. Where does it talk about, you know, that it's a particular data structure, for example? There's a lot of words here. Yeah, this is the aspect of it being predictive. Why don't we go to. Why don't we go to appendix 99? Or we'll say 106, sorry, appendix 106 line, column 19 lines 4 through 12. I'm sorry, 4 through 12. I think that's a better site. And this here is kind of consistent with the proposed construction, right? That's correct. So the answer to Judge Hughes' question is in the combination of user context and previous actions within the system to map specific context. How does that talk about a specific data structure? Isn't that just saying what I said is you use information about the user and their past searches to refine new searches? Here's my problem. I mean, I'll lay it on the table. To me, what you're putting in claim 14 is exactly that, that you use information about the user, about their past searches, about their demographics, and use it to generate better results in those searches. If that's what this patent is about, that's an abstract idea to me, and it's not how it's done. So what it needs to do is show how that's done in a specific way, with specific data structures or some specific invention, rather than just this more general idea of using these kinds of information to get better search results. Because we know from our past cases that collecting, analyzing, classifying, and displaying information in that kind of very broad claimed language, functional language, is not eligible. I mean, we have dozens of cases that say that. So what we're asking you, and I get it, there's a lot of language in here that feels like these are things that maybe are actual inventions, and there's lexicography, but when we ask you about them, you're pointing us back to very general language that doesn't say anything. If I could turn you to the complaint, Your Honor. I don't want to look at the complaint. You can do it if you want. I want to see it in the patent, because the patent is where you claimed your invention, and that's the first source. I know we have all this other stuff about what you can claim to get over a 12b6 motion and the like, but I want to see what the patent says your invention is. Yeah, I think the best place is in the claim, Your Honor, because it is saying it's not simply just taking information and moving it around. It is specifically taking this information that it got in a way that it wasn't available before, which is the… Well, you say that. You say that the user contact vector is a new form of the information, but then you don't say how you do that or what it means. I get it. If user contact vector was a kind of coin term or it's your invention, and you said, here's what a user contact vector is. Here's how you put that together. Here's the structure of the data. Like the FinGen case, where it's a security tag or something, and it says, here's the way that data structure works to increase security. That was a patent-eligible idea. Where is that correspondence to user contact vector in the specification? I still think 19, the spec that I showed you, I still think that's the best language because it tells you not only what's in it, but how it was obtained. So tell us, you were talking about lines 5 through something or other? Correct. 5 through 13. How does this explain? I mean, it says, inferences and conclusions are made regarding both the individual's user's preferred resource characteristics, and those of a common set of users. How? It's acquired through the system if you look at Figure 1 of the patent. What page is that on? That is on Appendix 90. If you're looking at Appendix 90, the user context vector is, if you go from Box 12 to the right, is where it first gets populated. And it also gets populated by user interaction records that are on the far right, 15. So there's different inputs going into the user context vector, and those are subsequently processed by the system overall. And the user interaction records, as I understand it, those are like prior searches? Prior and current searches. Does the patent tell you what those are more than prior searches? Does it say that those are where the system can see that a user likes particular search results, or what sort of detail does it give on that? I don't know if that's necessary, but I'm just curious. So, like, Claim 17 talks about how the combination of Claim 14 and Claim 17, how it's populated with each interaction with the system. Every search and the results go into that piece, or that part of the spec. And it's done on each query, so it's adaptive. It's done each time. I'm looking at the last limitation. So it prioritizes the records? It prioritizes the prior searches? It includes them. It's not where it's prioritized. It's prioritized later. So this is just all of someone's searches, and then using... But you're saying the patent does more than just taking all of the searches, and I don't know doing what with them. There's some way in which it prioritizes it to make it more useful to the user, right? That's the algorithm, Your Honor. That's the order and annotation algorithm that does the actual prioritizing. But that's not what we're talking about in Claim 14. That's the result of what it's mapped to in Claim 14. One of the things, there's different things that are touted as being technological improvements, either in the patent itself or in the inventor's declaration or the complaint. What claim limitations in Claim 14 do you think result in those? For example, the adaptive learning. Could you walk through how the claim limitation results in adaptive learning, for example? Sure, and again, this goes back to the vector itself. But if you look at appendix, I showed you 106, the predictive aspect, column 19, lines 35 to 62. Then you can go to the complaint itself. Let me make sure I ask the question. I think I've read all of that, and I know what the claim technological advantages are. What I'm wondering about is, is there a one-to-one correspondence between the claim and achieving those claimed technological advantages? So looking at Claim 14, what language in Claim 14 results in, for example, adaptive learning by the computer? We have to connect the dots with the complaint and the inventor declaration to get to the benefits come from the use of the vector because you're trying to get to the predictive aspect, and the benefits come from the vector itself. Is it the idea in the receiving user context vector, is it the idea that, let's see, not the idea, but what in the claim makes it so there's adaptive learning? Is it step B or step C or both of them? It's the ability, it's actually what's in the inventor declaration, Your Honor, that specifies that this is where they thought of changing heterogeneous information into homogeneous information to use for machine learning, which gets to the predictive. One of the things I see the district court saying is that those kinds of advantages aren't captured by the claim. I think he says that on page 30 of his opinion, has that idea. So what language should I be looking at to determine whether that's true or not? We would argue, Your Honor, that cooperative entertainment tells you the benefits of a claim can be part of it if you can show the benefits that are plausibly tethered to the claim language itself, that those benefits stem from it, and the inventor declaration and the complaint support the use of the vector to convert heterogeneous information to homogeneous information. What about Claim 17 where it says the annotation function being adaptable based on history of user interactions as provided into database of user interaction records? Is that something being relied on for adaptive learning? That's the part we talked about earlier in Figure 1, Your Honor. One of the inputs that gets fed into the vector itself is the current user interaction. We're way beyond time. We're still receiving a lot of time. Thank you. Thank you. Good morning. May it please the Court. Steve Siegel on behalf of Defendants in the Apoese Zillow Group Incorporated and Zillow Incorporated. I'd like to begin with several of the points that my colleague was making. The first is the question of specific implementation of the user context vector in Claim 14. I want to point out that the vector is just a data structure that has existed in mathematics. The concept of a vector is not something that IBM has claimed it has invented. We pointed this out in our red brief at page 21, I think, and IBM didn't contest that. It doesn't argue that vectors are unique to computer science, that they can only be applied in the context of computer applications. It doesn't even dispute that n-dimensional context vectors existed in the hierarchy or were conventional. They're instead saying that what's inventive is the way they use the vector, right? They're not claiming to have invented vectors, of course, but they're saying that the way they use the vector to improve the search results, that that's what their inventive concept is, right? To the extent that the way they use the vector is specific to the content of the vector, I think that's true. What IBM said at argument today and what it has repeated in its brief is that user context is information about the users. And so what IBM claims is novel about the vector is that it is, in their words, creating a homogenized set of heterogeneous variables into one data set that is specific to user interaction data or something about the user specifically. And I think this court's precedent, particularly in the electric power group case, is very clear that the content of the data doesn't make much of a difference at all to the abstract idea inquiry under Step 1, and it certainly doesn't help resolve the question of whether there's an inventive concept under Step 2. What if using a vector, for example, with particular content in it results in an improved system? You're saying that will never be considered eligible? Certainly not. No, that's not the case at all. I think there certainly would be applications when the use of a very particular, very specific data structure that had improvements to computer functionality, where those improvements were reflected in the claims, would likely be a candidate for eligibility under Section 101. What if I were to say an improvement to computer functionality is improving its searching capability in an Internet context where there are so many, it reduces the volume of search results that a person might get? Again, I think it would certainly depend on the facts of the case and specifically the claim language at issue. One of the concerns that this Court has repeated throughout its Section 101 jurisprudence is the concern about black box functional results-oriented claiming where a result is specified, which may be better search results for the user, but that in and of itself doesn't provide a sufficient concrete advance at Alice Step 2 to save an otherwise abstract idea from ineligibility under Section 101. Why not? In the context of this case, why not? Especially under 12b-6 where statements in the complaint and the specification are supposed to be taken as true. Statements in the specification and the claim are absolutely supposed to be taken as true, but there's a limit to that, which is that it has to be reflected, those innovations, those inventions have to be reflected in the claim language itself. Why isn't the idea of adaptive learning, although at a basic level, captured by the claim when it talks about mapping this user context vector, which as they say it should be construed and as you've agreed it could be construed, that includes prior user interactions with the searching system? The claims are very specific in what they require. In the context of Claim 14, what the claims say is receiving a user context vector and the specification confirms that this step of receiving a user context vector is the point at which the claims begin. There are a number of preprocessing steps that occur and that the specification refers to expressly as preprocessing steps. For instance, if you go to Appendix 99, Column 5, Lines 34 through 40, this is where the specification explains that the System 10 performs several preprocessing steps, including one creating an empty user context vector and then dot, dot, dot, populating the context vector with minimal information from external data elements 11. This continues at Column 6, Lines 61 through 63, where it explains with reference to this specific embodiment in the specification, which is the response set ordering meditation subprocess. Maybe my question wasn't well said, but could you look at the claim for me? Because I'm just going to focus on the claim right now. You can go to the spec if it answers, but I'm afraid that you've gotten a little far afield from what I was asking. My question is, why doesn't the claim as written capture the idea of modifying the search results, modifying the order of the search results and how things are annotated based on prior search results? Does it capture that? I don't think IBM has made any cogent argument for how the claims, at least in Claim 14, capture incorporating the results of the prior search result into the current search result. Let me try that. I hear what you're saying. Now, you agree user context vector includes, as defined for purposes of the 12b6 motion, it includes user context vector is going to have prior search results. A history of user interactions, I think. Correct. And then when it says applying an ordered in step C, I guess, mapping the user context vector with the resource response set to generate an annotated response set, having one or more annotations. And then it says controlling the presentation according to the annotations, right? I understand that's broad. But why doesn't that cover that you're using prior searches in order to change how those search results are provided to the user? So two responses. One, I don't think that IBM has made a cogent argument for how that captures. That's fine, but we've got to make this de novo. I want to know what you think of my question. I think that it doesn't really matter for purposes of the Section 101 analysis in the end, because even if we were to accept that the claims somewhere recited that, capturing the prior search results and reusing them in your next search to improve the ordering and presentation of search results, that still is presenting an idea. It is a claim to an idea itself. And so the next question at ALICE Step 2 becomes, what within the claims is there that is significantly more than the idea itself? And that's where this example, I think, falters most heavily because there is nothing within the claims other than the idea of capturing prior user interaction and then using it in another round of searching to improve the search results. That's the extent of what, according to IBM's interpretation of the claims, that's all it says. It doesn't say anything more than that. And I think this Court's precedent has been very clear that to save the claims at Step 2, there must be a specific and concrete improvement that is reflected in the claims themselves, something that is tangible as in the BASCM case, as in the Data Engine case. What do you think makes this not tangible? I mean, if it is, just going from the point of view that if searching technology is a technological field, then why isn't improving search results a technological innovation, even though it's software, even though it's methods? The general idea of improving search results is so broad that anything would fall within its scope. And so I think the Court's underlying concern about preemption, which generally has not itself become a predominant focus of the 101 Inquiry, is the motivating force behind why we require a specific and very concrete improvement that is reflected in the claims themselves. And this is where I keep stumbling. I apologize, Your Honor, but I can't... How do you distinguish Weiser? The Weiser case, and I think if you look carefully at the Step 2 analysis in that case, the Court was very clear that the specificity as to the mechanism through which they achieve improved search results, and I'm quoting from the opinion, through a location relationship with a reference individual or through the location history of the individual member who is running the search in a targeted geographic area, is sufficient, and that was sufficient in that case. But it was a very, very concrete and technical improvement to searching that was actually reflected in the claims themselves. And here we have the complete absence of that. All we have is a generic ordering and annotation mechanism that is described as a function. We don't know what it is. We have no idea as to its contents. We don't even know what the specific results are supposed to be. All we know is that it is applied as against a set of search results on one hand and a user context vector on the other. So what I hear you to be saying is that if the claims were directed to a more specific use, like identifying how the prior search results are used, then that could be eligible. That's absolutely a different case than the one that we have before us today, Your Honor. I think the only other point that I wanted to address was the question of homogenizing data. And I think I already addressed this somewhat, but the specification makes very clear that that process is just received as an input to Claim 14. So there is no process by which the claims recite homogenizing user context data. It is simply received as an input as part of the Claim 14 process and nothing further. If the Court has no further questions, I'll cede the rest of my time. Thank you. I think you went over, but we'll at least do three minutes of rebuttal if you need. Thank you. I just wanted to address Your Honor's point on the interactive aspect, or each time that each query is used as part of the user context vector. I think you can look at the claim itself, and it's the last limitation of the claim, which is controlling the presentation of the resource response set to the user according to said annotations, wherein the ordering and annotation function is executed interactively at the time of each user query so that the process is being done with each query. So it goes into the system, it goes into the vector, and then it gets used upon each use. And then you see that again in Claim 17, where the last limitation says generating the ordering and annotation function, said annotation function being adaptable based on a history of the interactions as provided in said database of user interaction records. So they work together in tandem where it's being fed each time and it's being used as part of the vector, as well as being applied to the algorithm itself. I did want to emphasize that IBM is not claiming that it patented or claimed a specific ordering and annotation algorithm in this patent. What it's claiming is that it's defining what inputs it's using to get information that wasn't previously used in the prior art to actually improve the process of finding better search results. What about the argument about the breadth of it, that it's so broad since you don't know exactly what data it's relying on? It is broad in the... I'm sorry. No, no, go ahead. It's broad in the sense of what data can be utilized for it. It's not broad in what you do with it. It's pretty specific in what you do with it. You put it in the vector, and then you apply it to the algorithm. But how it's actually obtained, the specification tells you where the information comes from. Some of the specification sites we already went over, it tells you what the data is and how it's acquired. And then if you go to the 193 patent, it gives you another indication of how it's acquired for that patent with the use of the three workspaces. So it's not claiming everything. It's claiming the specific implementations that are in these two patents. As far as... May I speak to the 193 patent? I don't think that's really proper because we didn't raise it with you initially, so the other side will not have an opportunity to respond to 193. So I think it's unless we want to give him time to respond to that, and I don't think we're going to go down that route. Okay. We'll rest on your feet. Thank you, Your Honor. We thank both sides.